No. 76,394

GARVEY ELEVATORS, INC., *Appellee,* v. KANSAS HUMAN RIGHTS COMMISSION AND ELI A. JACKSON, *Appellants.*

(961 P.2d 696)

Opinion filed July 10, 1998.

*Judy Fowler,* senior legal counsel, of the Kansas Human Rights Commission, argued the cause, and *Glenn Grayson,* staff attorney, of the same agency, was on the brief for appellants.

*John W. Jordon,* of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a racial discrimination/hostile environment/constructive discharge case brought under the Kansas Act Against Discrimination, K.S.A. 44-1001 *et seq.* (the Act). All of the racial epithets that form the basis of the complaint were from a single employee, Harry Bell, a co-equal of the African-American complainant, Eli A. Jackson. A favorable ruling for Jackson from the Kansas Human Rights Commission (KHRC) was reviewed under K.S.A. 44-1011 by the district court and dismissed. Garvey Elevators, Inc., (Garvey) is the employer. On appeal, the Court of Appeals reversed and remanded. 24 Kan. App. 2d 595, 948 P.2d 1150 (1997). Our jurisdiction results from granting Garvey's petition for review, K.S.A. 20-3018(b), Rule 8.03(a) (1997 Ct. R. Annot. 52). Neither Jackson nor the KHRC filed a cross-petition for review. See Rule 8.03(b) (1997 Ct. R. Annot. 55).

We consider two issues: Did the Court of Appeals err in: (1) deciding that the elements of a hostile work environment were present, and (2) remanding to the district court on an issue of constructive discharge? The answer is yes on both issues. We reverse the Court of Appeals and affirm the district court.

## FACTS

Garvey is a grain storage company with administrative offices in Hutchinson, Kansas. It has a Wichita terminal in two separate facilities, the "west elevator" and the "east elevator." Jackson was hired by Garvey in 1983 as an assistant superintendent, managing the east elevator. The west elevator was managed by Bell, a Caucasian, also an assistant superintendent who had no authority over Jackson. Jackson and Bell were supervised by Clarence Schwemmer, the terminal superintendent. Schwemmer's supervisor was Jack Hirsch, vice-president of terminal operations. After Hirsch retired, Harold Deardoff, Garvey's executive vice-president, assumed Hirsch's duties.

On several occasions, Jackson was assigned by his supervisors to tasks that were physical, rather than supervisory, in nature. In 1985, Hirsch, prompted by a complaint from Jackson, issued a directive that Jackson was to be treated like an assistant superintendent.

In 1989, Jackson was assigned to the project of cleaning grain storage bins. The Caucasian management employees were not involved in the cleaning. When Jackson found out that his assignment to the cleaning project was not to be temporary, but long-term, he quit.

The following factual statement provides the background for our analysis.

Besides the supervisory personnel, the Wichita terminal employed 18 hourly employees including scalemen, gallerymen, basementmen and general maintenance personnel. Of those 18, two or three were African-American. Stan Robertson, an African-American who was employed as a scaleman in the west elevator, testified as a witness for Jackson. Dale Reynolds, a Caucasian scaleman in the west elevator, testified as a witness for Garvey.

Hirsch supervised the Wichita facility. Although his main office was in Hutchinson, Hirsch visited the Wichita facility on the average of twice a month.

Shortly after Jackson began working for Garvey, he was dissatisfied about how he was expected to perform his job. A difference of opinion arose as to the method Jackson was using to mix the grain at the east elevator. Bell ordered Jackson to mix the grain Bell's way. Jackson took this matter to Hirsch, who told Jackson and Schwemmer that Jackson was to mix the grain by Jackson's own method.

On another occasion, Schwemmer reassigned Jackson's 3 full-time employees to another job. Jackson complained to Hirsch, who investigated the situation and determined that the assignment was justified. However, he directed Schwemmer to return Jackson's employees as soon as possible and to only reassign them in cases of serious emergency.

In 1985, Schwemmer assigned Jackson to "probe the sheds" (inserting a long probe into the grain and retrieving a sample of the grain to send to the state inspector). Jackson testified that he did not consider shed probing to be part of his job description. Jackson accepted the assignment. He told Schwemmer, however, that he would not probe again until both Schwemmer and Bell had done

so. Schwemmer testified that both he and Bell had probed the shed before Jackson's employment with Garvey.

Schwemmer reported Jackson's statements regarding future shed probing assignments to Hirsch, who then called a meeting in August of 1985. Jackson, Schwemmer, Bell, and Hirsch were present. Hirsch and Jackson both testified that the purpose of the meeting was to clarify Jackson's job duties and responsibilities. Jackson testified that the meeting also was to discuss the racial tension and derogatory comments that were being made at the plant.

Hirsch followed up the August meeting with a letter to Jackson, detailing Schwemmer's, Bell's, and Jackson's duties in the operation of the east elevator. Jackson testified that he complained to Hirsch about both his procedural difficulties and his belief that the problems were racially motivated. However, Hirsch testified that Jackson only related the procedural nature of the problems.

According to Jackson, Bell began making derogatory racial statements approximately 3 to 4 months after Jackson had been hired. While Jackson and Robertson were together with Bell, Bell said, "What do you think about those two nigger coaches?" (Bell was referring to high school basketball coaches.) Robertson asked him what he said, and Bell then repeated the question.

At another time, Jackson was present when Bell told another employee that there was no time to shut down the facility to make repairs and the employee would have to "nigger-rig it." Jackson also testified Bell commented that "if Blacks weren't so lazy our taxes wouldn't be so high."

The basic communication route between the east and west terminals was by two-way radio. Jackson testified that once Bell was speaking with Robertson on the radio, and they were having difficulty hearing each other because of the radio connection. Robertson radioed Bell that the radio was "fuzzy," and Bell called back and said "no, it's not the radio that's fuzzy, it's the Black man using it" or it was "those Black voices."

Jackson testified that he complained to Schwemmer about the "black voices" radio comment. Jackson was extremely angry and Schwemmer told him to "cool off" and they would speak about it later. Jackson told Schwemmer that he wished to speak about it

then and asked why he allowed Bell to "do and talk to people the way he does." Schwemmer replied that Bell could say and do anything he wanted, as long as Schwemmer said he could.

Schwemmer testified that he believed that Bell was not making a derogatory racial comment, but that Bell was just attempting to identify who was calling him on the radio.

The examination of Jackson by Garvey's counsel concerning Bell's comments over the radio proceeded:

"Q. And as the general superintendent you, yourself, carried a [two-way radio] hand set?

"A. Yes.

. . . .

"Q. And you had that with you at all times, didn't you, sir?

"A. I would say 99 percent of the time.

"Q. You also had that set on during the full workday, correct?

"A. Yes.

"Q. So you were in a position to hear Mr. Bell's communications not only to you but to other employees that he was talking to, is that correct?

"A. Yes. But there were times I would have to go to the bathroom.

. . . .

"Q. And is it also true, sir, that so far as your overhearing of Mr. Bell's communications during the day over the radio system that other than the remark about Black voices, that's the only time you heard Mr. Bell make a racial remark over the radio system, isn't that correct, sir?

"A. Yes. That is correct."

Jackson was questioned about previous statements that he made regarding the number of racial statements Bell made. Before the proceedings here, Robertson filed a discrimination action against Garvey. During Jackson's testimony in Robertson's case, the following exchange occurred between Garvey's attorney and Jackson:

"Q. As I understand your earlier testimony there was an incident when you overheard Harry Bell use the term 'nigger coaches,' and there was an occasion when he was talking to Marvin Weigand in which you overheard him use the term 'nigger-rig.' Now, other than those two occasions, have you ever heard Harry Bell make a racial remark to anyone?

"A. Not that I can remember."

Jackson explained:

"Q [By Garvey's Attorney]. But today in this [Jackson's] hearing you now remember additional comments by Harry Bell?

"A. Because he was talking to me. Harry Bell was talking to me on these additional comments.

"Q. Is it your testimony . . . . [that when] you answered my question during the Robertson case, that you were excluding the racial remarks that he made in your presence?

"A. When he and I were alone those were excluded."

Jackson testified that the comments by Bell never decreased, although the problem did diminish, because he attempted to avoid Bell whenever he could.

Other Garvey employees testified to comments they heard Bell make. Ken Byard, a Caucasian in charge of construction and maintenance, said Bell commented, "[I]t's hard enough for me to control these Mexicans let alone a nigger trying to do it." Also, Bell would refer to Jackson's office in the east terminal as the "nigger hut." These type of comments occurred every time Byard came to the facility.

Robertson said Bell made comments every day using the words "nigger" and "Black ass." He testified that even before Jackson started working at Garvey, Bell made derogatory racial comments about Jackson. According to Robertson, (1) Bell could not understand how Pillsbury would let a "nigger" run the elevator (Jackson previously had worked for the Pillsbury Company), (2) after Jackson started working at Garvey, Bell said "if he wanted a Black boy or a colored man to run the elevator, we could have put you down there instead of Eli Jackson," (3) Bell would refer to a white employee who became friends with Robertson or Jackson as "what's-a-nigger," and (4) Bell made negative comments about Robertson's driving a white man's car. Robertson also testified about the "nigger coaches" and "Black voices" comments.

Bob Baker, a Caucasian transferred to Wichita in anticipation of possibly replacing Schwemmer, testified that Bell said that all black people were lazy and that Jackson's only problem was that he was black. Bell also told Baker that Jackson spoke just like a "nigger." Baker testified that when the bin cleaning decision was made, Bell said that he was not going to be involved, because the "nigger's going to do it."

Schwemmer testified that he shared a desk with Bell and that he never heard Bell make a derogatory or a racist remark to anyone. He said the group was professional and would not make racial comments. He said that there was no racial animosity between any of the employees at Garvey. Schwemmer did admit that Jackson reported he felt that his job assignments were racially motivated. Schwemmer maintained that Bell never used the term "nigger."

Both Hirsch and Deardoff testified that Jackson did not complain to them about Bell's racial remarks. Jackson confirmed that he did not complain to Deardoff. Hirsch testified that although Jackson informed him about the operational difficulties he was having, he never reported any racial problems. Byard testified that Hirsch was aware of the racial comments by Bell. Robertson testified that he told Hirsch about the racial problems when Robertson left Garvey's employ in 1986. Jackson testified that he did inform Hirsch about the problem, on more than one occasion.

According to Baker, he often told Deardoff about the racial problems, and Deardoff said that although Bell and Schwemmer might be prejudiced, Deardoff was not.

Deardoff denied that Baker reported these issues to him and noted that Baker brought an age discrimination claim against Garvey when he was laid off.

Robertson testified that he complained to "management" about the comments by Bell, but eventually stopped complaining because nothing was ever done about it.

Because Jackson and KHRC did not seek review on the rejection of Jackson's disparate treatment claim by the Court of Appeals, the facts concerning grain storage bin cleaning which are in 24 Kan. App. 2d at 599-600 are not before us.

## The District Court's Opinion

The district court reviewed the record and transcripts from the KHRC proceeding de novo under K.S.A. 44-1011(b)(3). The journal entry of judgment contained 34 findings of fact and 17 conclusions of law. Summarizing, the district court concluded:

(1) Garvey was not liable for Bell's racial remarks because the supervisory personnel had not been sufficiently informed of Bell's

conduct, (2) Garvey was not liable for discriminating against Jackson in job assignments because it had legitimate reasons for its action, and (3) Jackson's working conditions were not so intolerable that a reasonable person would have felt compelled to quit; thus there was no constructive discharge. The district court set aside the KHRC's order and dismissed Jackson's complaint.

## The Court of Appeals Opinion

The Court of Appeals concluded that: (1) as a matter of law, the evidence showed that Jackson was subjected to a racially hostile work environment "as a result of Bell's continuous barrage of racial epithets." 24 Kan. App. 2d at 604; and (2) the work environment constituted an unlawful employment practice under K.S.A. 44-1009(a). 24 Kan. App. 2d at 603.

The Court of Appeals affirmed the district court's findings that: (1) Garvey had a legitimate, nondiscriminatory reason for Jackson's role in the grain storage bin cleaning project and (2) Jackson had failed to prove that Garvey's reasons were pretextual. Thus, Jackson's disparate treatment claim was rejected. 24 Kan. App. 2d at 603-04. The Court of Appeals remanded for determination whether Jackson was constructively discharged and, if so, to determine the nature and extent of the award to be entered under K.S.A. 44-1005. 24 Kan. App. 2d at 604.

## DISCUSSION

Garvey contends the Court of Appeals erred in:

(1) concluding, as a matter of law, that the racist attitudes of an elevator employee gave rise to the existence of a racially hostile work environment,

(2) making factual findings as to witness credibility,

(3) charging Garvey with knowledge of discriminatory acts based on a mid-level supervisor's knowledge (Schwemmer) of an employee's (Bell) racist attitudes, and

(4) remanding to the district court to rehear the issue of constructive discharge, where:

a. Jackson's resignation was not related to the harassment complained of, and

b. the district court would be considering the same evidence and applying the same legal standards used in making its initial ruling.

As a prologue to our discussion, we reference our standard of review. In *Beech Aircraft Corp. v. Kansas Human Rights Commission*, 254 Kan. 270, 275, 864 P.2d 1148 (1993), we said:

"Where the district court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. [Citation omitted.] The same rule applies to a trial de novo arising from a Kansas Human Rights Commission proceeding."

Thus, here, if there is substantial competent evidence to support the district court's findings and the findings are sufficient to support the court's conclusions, we will not disturb the conclusions on appeal. Although the case before the district court for de novo review was entirely on paper, an appellate court reviewing the record does not have the same prerogative as the district court to evaluate the credibility and weigh the evidence.

We addressed review of documentary evidence in *Kneller v. Federal Land Bank of Wichita*, 247 Kan. 399, 400, 799 P.2d 485 (1990):

" 'Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions, and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine *de novo* what the facts establish.' " (quoting *Stith v. Williams*, 227 Kan. 32, Syl. ¶ 2, 605 P.2d 86 [1980].)

However, we have crafted an exception to the documentary evidence exception.

"An exception to the rule . . . exists where there is conflicting written testimony and the court is called upon to disregard the testimony of one witness and accept as true the testimony of the other. In such a case, the standard of review on appeal is whether the findings of the district court are supported by substantial competent evidence." *In re Adoption of Baby Boy B*, 254 Kan. 454, Syl. ¶ 2, 866 P.2d 1029 (1994).

Here, there is transcribed testimony of many persons, resulting in conflicting statements. The district court's determinations of

credibility of the evidence in the record should stand, provided there is sufficient evidence to support its findings.

A brief review of the law of employment discrimination is appropriate.

K.S.A. 44-1009(a)(1) of the Act provides:

"It shall be an unlawful employment practice:

"(1) For an employer, because of the race . . . of any person to refuse to hire or employ such person to bar or discharge such person from employment or to otherwise discriminate against such person in compensation or in terms, conditions or privileges of employment."

Title VII of the federal Civil Rights Act of 1964 § 703(a)(1) makes it illegal "to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a) (1994). Given the similarity of the language of the state and federal provisions, it is appropriate to look to federal civil rights jurisprudence for general rules of construction.

## Hostile Work Environment

The United States Supreme Court in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993), a sexual harassment case, said:

"whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Payne v. General Motors Corp.*, 731 F. Supp. 1465, 1472 (D. Kan. 1990) observed:

"In order to establish that he worked in a racially hostile environment, a plaintiff must prove 'more than accidental or sporadic incidents of discrimination; [plaintiff] must show that "discrimination was the company's standard operating procedure—the regular rather than the unusual practice.' " *Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1267 (10th Cir. 1988) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 336 n. 16, 97 S. Ct. at 1855 n. 16). Casual comment or conversation will not trigger equitable relief pursuant to Title VII. *Accord Rogers v. Equal Employment Opportunity Comm'n*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972). Instead, there

must be 'a steady barrage of opprobrious racial comment.' *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)."

Mack A. Player, in his treatise Employment Discrimination Law (1988) (hereinafter "Player") provides an overview of employment discrimination law.

With regard to hostile working environments, Player states:

"To be actionable harassment must be in the working environment. . . . In addition, the harassment must be attributed to the defined "employer." Standing alone, work-place harassment by fellow co-equal employees will not violate the [civil rights act] because such actions are not those of a defined "employer." To attribute employee conduct to the employer, the employer must know or have reason to know of the employee harassment, and then fail to take reasonable and prompt action to stop the harassment. Only if the employer fails to correct the employee harassment will the employer be liable.

. . . .

"If the working environment becomes so hostile that a reasonable person would deem the conditions to be 'intolerable,' and the employee quits because of that environment, the quitting will be treated and remedied as a discharge. Quitting as a reasonable response to illegal treatment is a 'constructive discharge.' " Player § 5.60.

We first consider whether the Court of Appeals erred in determining that the elements of a hostile work environment were present here.

Before the Court of Appeals, KHRC and Jackson challenged the district court's findings of fact Nos. 17 and 18. The findings were:

Finding of fact No. 17: "With the exception of a phone call to Hirsch which preceded the memorandum in August, 1985, Jackson's complaints to Hirsch were presented solely as work related disputes without racial overtones."

Finding of fact No. 18: "Hirsch and Jackson each held the other in high regard and on every occasion that Jackson came to Jack Hirsch with a complaint, Hirsch acted promptly to rectify the problem, and Jackson would concede that Hirsch stood by him 100%."

The Court of Appeals held that there was substantial competent evidence in the record to support numbered findings 17 and 18 of the district court. 24 Kan. App. 2d at 602. No challenge to findings 17 and 18 is before us. Findings 17 and 18 are important because under the hostile environment theory, if the harasser is not the

victim's supervisor, the company cannot be held liable unless it knew or had reason to know of the hostile environment and failed to take prompt and effective action to remedy the situation. Player § 5.60. Bell was not Jackson's supervisor; he was a co-equal employee. (They both were assistant superintendents each in charge of a separate terminal.)

Also challenged by KHRC and Jackson before the Court of Appeals was the district court's finding of fact No. 23 and conclusion of law No. 14.

Finding of fact No. 23:

"At the Commission hearing Jackson expanded on his initial complaints to allege that, during the course of his employment, Bell made other racial remarks in his presence (when no one else was present) and such remarks were a continuous thing. Bell did not testify to rebut the making of racial comments and no reasonable explanation was offered to explain this absence as a witness. Mr. Jackson indicated that the racial remarks had stopped by the time of his resignation evidently because Jackson avoided contact with Bell. Significantly, the only complaint Jackson made concerning racial remarks was a phone conversation in early 1985 with Mr. Hirsch. In the phone conversation (which preceded the 1985 meeting to clarify Jackson's job duties) Hirsch told Jackson he would take care of it. Thereafter, from mid-1985 to the time of his resignation in 1989, Jackson never reported to Hirsch or any other supervisor that the problem was not resolved or that the racial remarks continued."

Conclusion of law No. 14:

"Complainant has not met his burden to prove respondent knew or should have known of the "continuous" racial comments by Harry Bell. Mr. Jackson tolerated the conduct by avoiding contact with Bell, but he made no reasonable effort to inform respondent of the problem. The only complaint made was in early 1985 in a telephone call to Mr. Hirsch. No complaint was made about any racial comment from mid-1985 to the time of complainant's resignation in 1989, and there is no persuasive evidence which leads the court to conclude that respondent knew or should have known of the comments which complainant acknowledges occurred only when he was alone with Bell. Respondent is not liable for a failure to act where it does not know and could not know of the problem. *Higgins v. Gates [Rubber Co.,* 578 F.2d 281 (10th Cir. 1978).]"

The Court of Appeals rejected neither finding 23 nor conclusion of law 14; rather, the panel criticized both "not so much for what is stated but because of what is not stated that was uncontroverted by the evidence." 24 Kan. App. 2d at 602. The Court of Appeals

made its own finding that Schwemmer's testimony "that he did not ever hear Bell make a racial comment is not susceptible to belief." 24 Kan. App. 2d at 603. The Court of Appeals opined that it was "wholly unreasonable to conclude Schwemmer did not have an awareness of Bell's racist attitudes" and imputed knowledge to Garvey. 24 Kan. App. 2d at 603.

Before the Court of Appeals, Jackson and KHRC had argued that: (1) a racially hostile environment was "beyond dispute," (2) the district court erred in concluding that management was not aware of Bell's offensive remarks, and (3) Garvey management should have known of the offensive remarks. Jackson and the KHRC also contended that "[t]here is no substantial evidence to support the district court's finding that Garvey Elevators did not condone a racially hostile work environment."

The Court of Appeals observed:

"Throughout its findings and conclusions, the district court ignores the uncontroverted evidence that conclusively establishes: (a) Harry Bell is an outspoken racist, and (b) Clarence Schwemmer knew or should have reasonably known of Bell's racism and the effect of that racism on working conditions for Jackson and other African-Americans working at the terminal. Both Jackson and Robertson complained to Schwemmer about Bell's racial remarks. Day in and day out, Schwemmer shared a desk with Bell. Schwemmer's testimony that he did not ever hear Bell make a racial comment is not susceptible to belief. It is wholly unreasonable to conclude Schwemmer did not have an awareness of Bell's racist attitudes.

"Schwemmer was the superintendent of the terminal. What he knew or should have known is imputed to Garvey. We conclude that as a matter of law the evidence shows Jackson was subjected to a racially hostile work environment constituting an unlawful employment practice under K.S.A. 44-1009(a)." 24 Kan App. 2d at 602-03.

In so ruling, the Court of Appeals made a credibility judgment. The district court's findings and conclusions were supplemented on the ground that there was other evidence in the record that supported KHRC and Jackson's position.

The function of the appellate court is not to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact. Our only concern is with evidence that supports the district court's findings and not with evidence that might have sup-

ported contrary findings. *Care Display Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, 237, 589 P.2d 599 (1979).

We have said that in reviewing a district court decision, we must accept as true the evidence and all inferences supporting the findings. We must disregard any conflicting evidence or other inferences. *Tucker v. Hugoton Energy Corp.,* 253 Kan. 373, 377-78, 855 P.2d 959 (1993).

With the limitations on appellate review in mind, we examine the evidence supporting the district court's findings and conclusions on hostile environment. The district court's findings and conclusions on constructive discharge, which we discuss later in the opinion, also support the conclusion of the absence of a hostile environment.

1. Jackson's complaint before KHRC listed 3 instances of Bell's racial remarks, all of which occurred early on in his employment with Garvey. (Finding 20.) These specific remarks occurred early on in Jackson's employment and were far removed from the time of his resignation (Finding 21). Jackson testified under oath in an earlier KHRC proceeding involving Robertson that those were the only times he heard Bell make a racial remark.

2. Although Jackson testified he had complained to Hirsch about Bell's racial remarks before the August 1985 meeting at Hutchinson, Hirsch disagreed.

3. Schwemmer testified that he shared a desk with Bell and he never heard any racial remarks by Bell, except the "Black voices" comment.

4. Jackson said that he never contacted or complained to Deardoff, Hirsch's successor, about racial remarks by Bell, or for that matter, about any other aspect of his employment with Garvey Elevators. (Finding 25.)

5. Jackson testified that at the time of his resignation, Bell's racial comments had stopped because he just avoided contact with Bell. (Part of Finding 23.)

6. Jackson's complaints of racially derogatory remarks are directed only at Bell. Jackson and Bell held equal employment rank and neither had supervisory authority over the other. (Finding 19.)

The Court of Appeals erred in substituting its judgment for that of the district court and in (1) making factual findings as to the weight of the evidence and credibility of witnesses, (2) concluding that the environment was sufficiently racially hostile to violate the law, and (3) charging Garvey with knowledge of the hostile environment.

We now review the Court of Appeals' remand on an issue of constructive discharge. Before the Court of Appeals, Jackson and KHRC asserted that the district court's conclusions of law Nos. 14 through 17 should be reversed because they were not sufficiently supported by the findings of fact. We have previously set out conclusion No. 14. Conclusion of law No. 15 states: "Complainant's working conditions did not reach the level of intolerability as would compel a reasonable person to quit and his resignation did not amount to a constructive discharge." Conclusion of law No. 15 is neither referenced in the Court of Appeals' opinion nor challenged before us by either Jackson or the KHRC.

Conclusion of law No. 16 addressed Jackson's job assignments, concluding: "Complainant did not present persuasive evidence that the legitimate reasons offered by the respondent were a pretext for discrimination." (This conclusion was neither referenced by the Court of Appeals nor challenged before us). Conclusion of law No. 17 dismissed Jackson's complaint.

The Court of Appeals, as a result of supplementing finding of fact No. 23, held "as a matter of law the evidence shows Jackson was subjected to a racially hostile work environment constituting an unlawful employment practice under K.S.A. 44-1009(a)." 24 Kan. App. 2d at 603. The Court of Appeals remanded to the district court for determination "whether the discriminatory acts were sufficient to establish a constructive discharge from employment." 24 Kan. App. 2d at 604.

Findings of fact that support the district court's conclusion that the requisite level of intolerability to justify constructive discharge had not been met are:

Findings Nos. 17 and 18 set out earlier in the opinion (upheld by the Court of Appeals and not challenged here).

Finding of fact No. 21 (not challenged on appeal): "The specific racial remarks complained of by Jackson in said written summary occurred early on in Jackson's employment and were far removed in time from the date of his ultimate resignation."

Finding of fact No. 22 (not challenged on appeal): "The majority of Jackson's contacts (95%) with the west elevator office (and Bell) were over the two-way radio system. Jackson testified that, except for Bell's comment about the "Black voices," he never heard Bell make a racial remark over the two-way radio system."

Finding of fact No. 23 (supplemented but not rejected by the Court of Appeals and quoted earlier in this opinion).

Finding of fact No. 25 (not challenged on appeal):

"Deardoff continued Hirsch's policy of periodic visits to the terminal site to confer with supervisory personnel, including Eli Jackson. Deardoff testified that in none of such visits had Jackson indicated he was in any way dissatisfied with any aspect of his employment with Garvey elevators. Jackson never contacted or complained to Harold Deardoff concerning job assignments, work procedures, or remarks or other actions by Harry Bell, or on any other aspect of his employment with Garvey Elevators."

We conclude by noting the significance of Finding of fact No. 33 (not challenged on appeal): "Jackson's decision to resign was the direct result of his assignment to the bin cleaning project. He felt the job assignment signaled a trend back toward unfair job assignments of the type he experienced during his initial years of employment with respondent."

These findings are sufficient to support the district court's conclusion that the racial atmosphere was not intolerable.

We certainly do not condone the racial animus in the remarks attributed to Bell appearing in the record. However, we must be guided by the rules of appellate review. The legislature has established the district court as the trier of fact in a de novo review of a KHRC order. K.S.A. 44-1011(b).

The Court of Appeals is reversed. The district court is affirmed.