NOT DESIGNATED FOR PUBLICATION

No. 115,026

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PINNACLE POINTE, LLC,
*Appellee*,

v.

BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed August 26, 2016. Affirmed.

*Kathryn D. Myers*, assistant county counselor, for appellant.

*Benjamin J. Neill*, of Property Tax Law Group, LLC, of Overland Park, for appellee.

Before GARDNER, P.J., BUSER and STANDRIDGE, JJ.

*Per Curiam*: In this equalization appeal, the Board of County Commissioners of Johnson County, Kansas (County), challenges the judgment of the district court reducing the property value the County assigned residential real estate owned by Pinnacle Pointe, L.L.C. (Pinnacle Pointe), for ad valorem tax purposes in 2013. According to the County, the district court erred as a matter of law and fact when it ruled it was appropriate to lower the property's investment class, a factor which determines the capitalization rate that is used in the computation for the income approach to valuation. Having carefully reviewed the arguments and record on appeal, we affirm the district court's judgment.

Pinnacle Pointe owns and operates a 2-story, 160-unit garden apartment complex (Complex), which offers 1, 2, and 3 bedroom apartments. The Complex is located at 103rd Street and Pflumm Road in Lenexa, Kansas. It has 694,621 square feet of land area, 159,184 square feet of gross building area, and 149,816 square feet of net leasing area. Although the Complex is located near and visible from the junction of Interstate Highways 35 and 435, it is not directly accessible from either highway.

For the 2013 tax year, the County valued the Complex for ad valorem tax purposes at $12,120,000 based upon an appraisal performed by Perry Bailey, a registered mass appraiser at the Johnson County Appraiser's Office. Bailey had three accepted ways to conduct his appraisal:

> "There are three recognized approaches to appraising real estate: (1) the sales approach, which uses sales of comparable properties to estimate value; (2) the cost approach, which uses the cost of the land and buildings to estimate value; and (3) the income approach, which uses the income generated from the property to estimate value." *In re Tax Appeal of Porter House Apartments*, No. 108,579, 2013 WL 6726257, at *3 (Kan. App. 2013) (unpublished opinion).

Bailey relied primarily on the income approach, which is represented by the following equation: V (value) = NOI (net operating income) / R (the direct market capitalization rate).

According to the County:

> "NOI is arrived at by determining projected gross income through market rents less market vacancy and collection loss and less market expenses subject to property characteristics. The direct capitalization rate is determined by a capitalization rate study

for office, most retail, industrial and apartments commissioned from an independent appraisal firm, David Craig and Company, Inc."

The direct market capitalization rate is tied to the subject property's investment class. In fact, the income approach begins with the identification of the subject property's market area and the assignment of an investment class to each property within that defined market area. Appraisers assign an investment class by "considering location, year built, unit size, condition, rental income generated, construction quality, income, renovations, etc."

Both parties agree that the various investment classes for apartment complexes may be described as follows:

"**CLASS**      **DESCRIPTION**

"**Class A**      The Average 'A' is generally less than ten (10) years old (effective age), generally with full amenities, and generating typical rents for the area. Any two (2) of the three (3) factors below could push the class to the high range of 'A+.' Note that a well maintained property with an actual age of 10 years may have an effective age of less than 10 years.

1. Good condition for the age.
2. Larger than the average unit size.
3. Located in the most desirable locations.

Any two (2) of the three (3) factors below could place the project in the low range of 'A-' (all three (3) could lower category to 'B+').

1. Property showing deferred maintenance.
2. Smaller than the average unit size.
3. Located in a less desirable area.

3

"**Class B**        Generally, approximately ten (10) to fifteen (15) years old (effective age) full amenities with the most desirable area at the top of the range 'B+.' This could also be a newer property in a less desirable area, quality and/or no amenities. The less desirable location, and smaller units and limited amenities would be at the low range 'B-.'

"**Class C**        Generally, approximately fifteen (15) to twenty (20) years old (effective age) average quality and condition, typical unit sizes and types, and less amenities. Again, most desirable areas being at the top of the range 'C+.' If the property is 'an all utilities paid' project, drop it in category (i.e. from a 'C+' to 'C').

"**Class D**        Generally properties twenty (20) years old (effective age) with little or no remodeling done. Usually units with high maintenance and expenses. All utilities paid projects and those in less desirable areas would be at the low range 'D-.'

"**Class E**        Projects totally shut down and/or boarded up in less desirable areas."

Each investment class has its own defined capitalization rate and for the 2013 tax year, Bailey determined that the Complex qualified as a Class A- property.

Of note, the County's 2013 valuation of $12,120,000 differed from the value assigned the Complex for the 2011 tax year, when the Court of Tax Appeals (COTA) determined that the Complex's fair market value was $9,418,500. This determination was made after the County valued the property at $10,450,000 pursuant to an investment class rating of A- and Pinnacle Pointe filed an equalization appeal with COTA, alleging that the Complex was a Class B property and its value should not have increased from its 2010 value of $9,457,000.

At the administrative hearing, Kelli Taylor, the Complex's manager, testified that the Complex has less amenities than its competitors, the Complex is located in a less

desirable location, and the Complex has several maintenance issues, *i.e.*, the water heaters were past their rated life, some of the water heaters and air conditioning units had recently been replaced, and the Complex's chimneys were leaking and needed repair. Ultimately, COTA determined that the Complex's value should be reduced to $9,418,500 based upon some modifications it deemed were necessary to the County's income approach.

While it appears COTA did not amend the Complex's investment class rating as part of its 2011 tax year valuation, it made these findings regarding the investment class issue:

> "Class 'A' properties are typically less than ten years old and have full amenities while Class 'B' properties are between 10 and 15 years old with fewer amenities. The evidence in this case shows that the [Complex] is 12 years old and that the amenities seem to be limited as the swimming pool is small and the exercise area is minimal. Although not bad, the [Complex]'s location would not be described as the most desirable. Ms. Taylor testified as to the subject property's deferred maintenance with water heaters and air-conditioning units that need to be replaced. All in all, a strong argument can be made for reducing the [Complex]'s investment class."

Returning to the litigation on appeal, Pinnacle Pointe filed an equalization appeal with the Board of Tax Appeals (BOTA), see L. 2014, ch. 141, sec. 1 (effective July 1, 2014, COTA became BOTA), challenging the County's valuation of $12,120,000 for the 2013 tax year. Pinnacle Pointe asserted that despite the County's determination to the contrary, the Complex had an investment class rating of "no better than a B minus" due to its age, less than desirable location, limited amenities, and its condition.

In response, the County recommended a reduced value of $11,466,000 "[i]n an attempt to be as conservative as possible on the valuation of the property" and to account for the "numerous deferred maintenance issues" that Pinnacle Pointe had raised.

5

According to Bailey, the County calculated this value by amending its investment class rating from an A- to a B+: "The only change that [the County] made was to the cap[italization] rate bringing it from an A minus cap[italization] rate to a B plus cap[italization] rate. The ranges for the income, vacancy and collection, [and] expenses, they all are still within B investment class ranges."

The administrative hearing was held on July 14, 2014. At the hearing, BOTA heard testimony from Bailey and Taylor. Taylor, who has held the position of property manager at the Complex for 8 years, testified as to its condition and comparability to apartment complexes in the general vicinity. With respect to the Complex's location, Taylor noted that because there is no direct access from I-35 or I-435, tenants have to travel a "little square" when driving to/from the highways and the office frequently receives phone calls from visitors and prospective tenants requesting driving directions. Taylor also maintained that the highways create noise and odor issues for some of the tenants. As a consequence, she has a difficult time leasing the apartments in one particular building.

According to Taylor, the Complex's apartments are somewhat smaller than those offered by other Johnson County complexes in that market area. Likewise, Taylor testified that with respect to amenities, the Complex does not have "half of what the other surrounding properties have," because the Complex merely offers a swimming pool and a small clubhouse/fitness room with limited equipment: "While every other complex has a pool and a fitness center, they have a lot more. Tennis courts, some of them have—almost all of them have whirlpools or a spa. Almost all of them have business centers, . . . [and] some have car washes, dog parks."

In order to compensate for the limited amenities, Pinnacle Pointe offers weekly move-in specials and Taylor reviews market surveys for comparable apartment complexes once or twice a month to ensure the rental rates are "a little under" most of the

6

rentals in the area. Taylor also testified that the Complex's rental rates include water, sewer, trash, and a carport.

The Complex, which was built in 1999, has not been renovated; accordingly, Taylor maintained the 14-year-old Complex suffers from age-related deterioration and deferred maintenance. In particular, Taylor testified about the following problems:

- The "entire drive area needs [to be] resurfaced because of large cracks that keep coming back" despite previous repair efforts. Likewise, the breezeways and 90% of the sidewalks in the complex are cracked. A bid for the necessary repairs amounted to more than $400,000.
- The stairwells are "rusting out."
- Various windows are leaking.
- About 85% of the air conditioners in the Complex are original and need to be replaced due to age. According to Taylor, replacement will be difficult, however, because the "R22 is being phased out" and a different air conditioner model will need to be purchased, which will require management to replace the condensing unit and A coils as well. One bid for a new air conditioning unit was $955.07, and with installation the cost increased to $1415.28 per unit.
- Most of the apartments still have original carpeting and appliances. Taylor explained, "Since I have been there I haven't replaced hardly any of the appliances unless they're just completely unfixable. So most of the appliances are original. Carpets, carpets are starting to need to be replaced, because . . . you can only shampoo them so many times."
- The majority of the water heaters in the Complex were installed in 1999 and are nearing the end of their useful life. A bid for the replacement of one water heater was $986.22.

- There is no ice barrier or flashing around the Complex's chimneys and water is leaking into the apartments. Each repair was estimated to cost $750.
- The roof and siding has hail damage.
- Water is leaking through the stone façade on a couple of the buildings into the apartments.
- The linings of the Complex's two retaining ponds have cracked, resulting in water constantly leaking through the cracks.
- The fence that runs along the northwest side of the property near the highway needs to be replaced. According to Taylor, the fence is "basically not there anymore" because only the fence posts remain.
- There is severe drainage erosion on an easement on the northwest corner of the property, which has caused several utility pipelines that run along the property to become exposed and a couple of trees on the property to fall down. The City of Lenexa sent Pinnacle Pointe a letter on May 9, 2012, informing them that the drainage channel had not been properly maintained and urging them to remediate the issue. Based on two estimates offered by Pinnacle Pointe, it will cost about $63,665 to $72,241.39 for repairs.

According to Taylor, with the exception of carpet replacement, the Complex's maintenance staff handles repair work in-house whenever possible. She acknowledged, however, that the Complex's maintenance issues were "periodic things that would come up in any apartment complex" and that "people [were] still renting and staying at the . . . [C]omplex, in spite of all of these different maintenance issues." As of the date of the administrative hearing, the Complex had an occupancy rate of 97.9%.

Bailey testified on behalf of the County. According to Bailey, in his opinion, the property was not performing below an A investment class rating because its deferred maintenance issues have not negatively impacted the Complex's occupancy or income.

When asked if he was still recommending a value of $11,466,000, Bailey replied, "To be honest with you, I would like to withdraw this, but since [the County] made the offer, the [C]ounty is still going to stand behind it and recommend[ ] that value."

Bailey explained that based upon his review of the Complex's income and expenses for the years 2010, 2011, and 2012, the Complex was not performing below an A investment class rating because it was not a property in decline and it was "performing better year after year." In support of his opinion, Bailey testified that the Complex has a better-than-average vacancy rate. The complex is located within the west rental market of Johnson County, which has an assigned vacancy rate of 6%, plus a 1% collection loss, for properties falling within the A and B investment classes. Based upon a rent roll Bailey received from Pinnacle Pointe for December 2012, Bailey concluded that the Complex had a vacancy rate of just under 2%. Next, according to Bailey, the Complex's potential gross income (PGI) and NOI for 2013 was "somewhat higher than the market . . . used by the [C]ounty." Finally, Bailey noted that on July 1, 2010, Pinnacle Pointe refinanced the Complex, and the financing Pinnacle Pointe obtained fully supported the value the County had assigned to it.

Bailey personally inspected the Complex on October 4, 2013. He testified that while the Complex only offered a "somewhat small workout facility and a somewhat small pool," these amenities were comparable to those typically offered at properties with an A- investment class rating. Bailey explained:

"[In] looking at the comparables used, and in looking at those properties recently, they are pretty comparable as far as amenities. A couple of them may have some extra amenities but nothing significant.
. . . .
"Upon visual inspection, there were a couple properties that—one had a tennis court, one had a volleyball court, one of them had a pond and a playground, but nothing substantial no."

9

Bailey acknowledged, however, that the Complex's apartments are "[s]lightly" smaller than the average apartment in Johnson County. Moreover, Bailey conceded that the Complex is not located in a "most desirable" location because traffic noise could be heard on the south side of the Complex from I-435. Nevertheless, Bailey maintained that the Complex's location would still be considered desirable:

> "Actually, I believe it's a good location. They advertise that it has easy access to the interstates.
>
> . . . .
>
> "I might add also that in spite of their claims that the location is a detriment, to me, it's far from it. Not only do you have fairly easy access, but you have exposure from the traffic. And they have a sign advertising the property. So it's, it's—it's really good advertising for the property for anybody [who is] traveling those roads and live[s] in that area."

Bailey also maintained the Complex did not exhibit significant deferred maintenance:

> "Typical deterioration for any property that has—a few years old, but most of the things that I saw are typical. I mean, anyone as a property owner knows that you're going to have issues through deterioration and that you have upkeep. . . . Whether or not you decide to reinvest [in] the property is a management or ownership decision.
>
> . . . .
>
> "It shows a little bit of age. I'm certainly not going to say it's in bad condition, it's not in bad condition."

Bailey testified that other than the drainage erosion, a "leak in their swimming pool or something," and the retention ponds failing to retain "as much water as they'd like," Pinnacle Pointe raised the same deferred maintenance issues in 2011, and he pointed out the Complex had made no "attempt to do any full repair of any of these issues" over the course of the ensuing 2 years.

10

Bailey opined that neither the location nor the deferred maintenance appeared to be having any detrimental effect on the Complex based on its occupancy rate and income: "I think as opposed to a property being in decline, this property is showing that it is thriving and making more money year after year." Moreover, while deferred maintenance impacts the investment class of a property, Bailey claimed that deferred maintenance is only considered if it is affecting the performance of the property and, in this case, it was not affecting the Complex's performance.

After considering the evidence, BOTA issued an order affirming the County's appraised value of $11,466,000. BOTA found that the County appropriately accounted for the deferred maintenance cited by Pinnacle Pointe when it assigned the Complex a B+ investment class rating because the maintenance issues had not adversely affected the Complex's occupancy rate. BOTA explained:

> "The [Complex] was built in 1999, making it about 14 years old by the appraisal date. Thus, the [Complex] would likely not be an A class property but would fall in the B to C range. However due to the [Complex]'s performance, most notably an unusually low vacancy rate, the County's witness testified that it is actually a Class A- property. Yet to address the deferred maintenance, the County classified it as [a] B+ property. In order to be classified as a B+ property, it would have full amenities and be in the most desirable area. In contrast a C+ property would be of average quality and condition and have less amenities but still in a most desirable location. Based on those parameters, the [Complex] is located in a most desirable area. Thus, the desirability of the [Complex]'s location seems not to be in dispute.
>      . . . .
>      "The Board finds that the County has already accounted for deferred maintenance in setting the investment class at B+. The issues cited by [Pinnacle Pointe] are not reflected in the [Complex]'s occupancy. Since these issues have been present since 2011 and have not affected the [Complex]'s occupancy, the County's investment class and requested value are well supported."

11

Pinnacle Pointe timely appealed BOTA's order. Because "[a]ny aggrieved person has the right to appeal any final order of [BOTA] issued after June 30, 2014, by filing a petition with the court of appeals or the district court," Pinnacle Pointe timely petitioned for a "trial de novo" in the district court. See K.S.A. 2015 Supp. 74-2426(c)(4)(A).

The sole issue before the district court during the trial de novo was determining the proper investment classification for the Complex. The County urged the district court to affirm BOTA's determination that the Complex qualifies as a Class B+ property, while Pinnacle Pointe maintained the Complex merited the C+ investment classification because the Complex had an effective age greater than 14 years due to its deteriorating condition, limited amenities, smaller than average apartments, and an undesirable location.

On December 15, 2015, the district court issued its memorandum decision. The district court found that despite BOTA's determination otherwise, the Complex should be classified as a Class B- property. After noting that the Complex did not fall within an A investment class because it had an effective age of 14 years due to Pinnacle Pointe's failure to complete any renovations that would justify a reduction to its effective age, the district court found "the appropriate range for . . . the [Complex]'s investment classification is between B+ and C+."

The district court then considered "the unit size, level of deferred maintenance, whether the [Complex] is at a prime or desirable location, and the quality of amenities offered." Upon weighing these factors, the district court determined the Complex "resembles a B- investment class property." The district court explained:

> "The [Complex] suffers from severe deferred maintenance and requires a
> significant reinvestment into the property. Water heaters and air conditioning units, both
> appliances necessary to rent space, are mostly the original units from when the property

12

opened in 1999. They are currently being replaced on an as-needed basis as each unit fails. The air conditioning units will require full replacements, as certain necessary parts to repair the current units are being phased out into obsolescence, and will require [Pinnacle Pointe] to purchase new units at a significant cost. Although the property is located nearly one mile from entrances to I-435 and I-35, the property suffers from road noise and exhaust fumes near certain buildings. While the [Complex] is in a desirable location for access to major highways, its inconvenient location makes it difficult to access from those highways. Despite this, the [Complex] maintains a vacancy rate of less than two percent. The amenities offered by [Pinnacle Pointe] resemble other apartment complex properties with limited amenities. The swimming pool is small and the fitness center has limited fitness equipment. While [Pinnacle Pointe] offers carports and garages at the [Complex], the amenities available at the [Complex] are inferior to other apartment complexes in the area, taking into account that other complexes offer amenities including sand volleyball courts, carwashes, spas, and dog parks. When taking into account the totality of the significant deferred maintenance, subprime location, and inferior amenities, the [Complex] resembles a B-investment class property."

The County filed a timely appeal of this adverse judgment.

ANALYSIS

On appeal, the County contends the district court "erroneously interpret[ed] and appl[ied] the law; determine[d] a fact, made or implied, that [was] not supported by evidence that [was] substantial when viewed in light of the record as a whole; and otherwise act[ed] unreasonably, arbitrarily and capriciously" when it lowered the Complex's investment class rating from a B+ to a B-. In response, Pinnacle Pointe claims the district court's decision is both legally and factually correct and should be affirmed.

At the outset, the procedural posture of this case is unique because it is one of the first tax cases to come before our court by way of the district court rather than BOTA. Effective July 1, 2014, the legislature amended the judicial review procedures set forth in

13

K.S.A. 2015 Supp. 74-2426(c). L. 2014, ch. 141, sec. 1. In particular, orders from BOTA are reviewed pursuant to the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, except that any aggrieved person has the right to appeal any final order issued by the BOTA after June 30, 2014, by filing a petition with this court or the district court. K.S.A. 2015 Supp. 74-2426(c)(4)(A). Moreover, relevant to this litigation "[a]ny appeal to the district court shall be a trial de novo." K.S.A. 2015 Supp. 74-2426(c)(4)(A).

Pinnacle Pointe opted to file a petition for review of administrative action with the district court. See K.S.A. 2015 Supp. 74-2426(c)(4)(A). Thereafter, with the agreement and consent of the parties, the district court conducted a trial de novo by making independent findings of fact and conclusions of law with regard to the proper investment class rating for the Complex based upon its review of the parties' written submissions and the administrative record. See K.S.A. 2015 Supp. 74-2426(c)(4)(A). This approach was memorialized in the district court's decision which stated that "the parties have agreed that the standard of review is on the record from the BOTA; but this Court may disregard the findings and conclusions of BOTA and make its own findings and conclusions, but [the court] otherwise is controlled by the Act for Judicial Review."

Under the KJRA, "the validity of agency action shall be determined in accordance with the standards of judicial review provided in this section." K.S.A. 2015 Supp. 77-621. That review identifies eight factors for which a court may grant relief. K.S.A. 2015 Supp. 77-621(c)(1)-(8). In this appeal, the County seeks our review of three of those factors relating to the district court's findings: (1) Did the district court erroneously interpret and apply the law? (2) Did the district court determine a fact, made or implied, that is not supported by evidence that is substantial when viewed in light of the record as a whole? and (3) Did the district court otherwise act unreasonably, arbitrarily and capriciously? See K.S.A. 2015 Supp. 77-621(c)(4), (c)(7), and (c)(8).

Notably, on appeal, the parties cite *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 212 P.3d 239 (2009), for our appellate standard of review under the KJRA. *Herrera-Gallegos* provides:

> "Under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*, an appellate court reviews an agency's factual findings to see whether substantial evidence supports them in light of the whole record, considering evidence both supporting and detracting from the agency's findings. This substantial-evidence standard evaluates the reasonableness of an agency's conclusion in terms of the evidence. Substantial evidence is such evidence as a reasonable person would accept as sufficient to support a conclusion." *Herrera-Gallegos*, 42 Kan. App. 2d 360, Syl. ¶ 1.

As understood by Pinnacle Point, "[i]t is Judge Moriarty's independent findings of fact that are the subject of this appeal. Under this new 'de novo' appeal it is the district court's findings that are reviewed by the Court of Appeals. It is the district court that is the 'agency' being reviewed as the Workman's Compensation Board was in *Herrera-Gallegos*, supra."

Given the parties' agreement, we will review this appeal employing the standard of review provided under the KJRA. To use this standard, set forth in K.S.A. 2015 Supp. 77-621, requires us to review the district court's findings as if they were made by the administrative agency.

We note that we find no difference related to this case in applying that standard as opposed to the one we might ordinarily apply in reviewing any judge-tried civil case. Normally, when a district court makes both findings of fact and conclusions of law based on the trial de novo we apply our traditional standard of review on appeal. That standard, as applied to such a case, requires us to determine whether the findings, when viewed in the light most favorable to the prevailing party, are supported by substantial competent evidence and are sufficient to support the district court's conclusions of law. See *Garvey*

15

*Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 492, 961 P.2d 696 (1998); *Reeves v. Equipment Service Industries, Inc.*, 245 Kan. 165, 176-77, 777 P.2d 765 (1989); "'Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined.' [Citation omitted.]" *In re Equalization Appeal of Wagner*, 304 Kan. 587, 599, 372 P.3d 1226 (2016). Both this test and the KJRA's substantial-evidence test seek to determine whether substantial-evidence supports the decision.

Next, we apply the substantial-evidence standard of review to the merits of the County's argument. The County claims the district court erred when it reduced the Complex's investment class rating from a B+ to a B- because the district court operated under an erroneous interpretation of Kansas law and its factual findings are not supported by substantial competent evidence. After carefully reviewing the record and the parties' briefs, however, we find that substantial competent evidence properly supports the district court's factual findings and its conclusions of law.

The County generally asserts the district court erroneously interpreted and applied the law. This assertion is not clearly stated or developed in the County's briefing. For example, one of two arguments presented by the County is designated: "The District Court Does Not Understand Investment Class Determinations." Preliminarily, we usually do not review and rule on a party's opinion of the level of comprehension of district court judges. Rather, we evaluate whether the district court judge properly applied the correct law to the facts of the particular case. Still, we discern no confusion or misunderstanding by the district court that constitutes reversible error.

In making its legal argument, the County asserts the district judge "misstated choice words" in its summarized definition of A and B investment classifications. But the district judge was not required to state verbatim definitions, and its failure to include the

16

word "generally," for example, in its memorandum decision summarizing the investment classifications does not prove an improper application of the relevant law.

In its ruling, the district court stated: "The sole issue before this Court is to determine the proper investment classification of the Subject Property." The district court's description of the various investment classes is largely consistent with the definitions set forth in the County's capitalization rate study, and the manner in which the district court discussed the evidence demonstrates its understanding of the parameters of each of the investment classes. Having reviewed the district court's memorandum decision, we conclude the County has failed to show the district court erroneously applied the law in making its determination of the proper investment classification.

Similarly, the County's claim that the district court's ruling was not supported by substantial competent evidence also lacks merit. The County's challenge to the sufficiency of the district court's findings essentially boils down to its belief that the district court improperly weighed the evidence. According to the County, "[t]he district court took the testimony of [Taylor] as true without any critical analysis of the evidence to the contrary."

While the district court was persuaded by Taylor's testimony, that is the function of the finder of fact. As detailed in the Factual and Procedural Background section of this opinion, there was considerable evidence—much of it challenged—that was presented by both parties. Upon our review, this evidence supports the district court's determination that the Complex qualifies as a Class B- property because it has a less desirable location, a significant amount of deferred maintenance, smaller than average apartments, and limited amenities. While some of Bailey's testimony may have supported a contrary conclusion, we do not reweigh the evidence or make credibility determinations when reviewing factual findings. See *Cresto v. Cresto*, 302 Kan. 820, 835, 358 P.3d 831 (2015).

Upon our review of the memorandum decision, the County's arguments, and the record on appeal, we hold the district court did not erroneously interpret and apply the law, determine a fact that that is not supported by substantial and competent evidence, or otherwise act unreasonably, arbitrarily, or capriciously.

Affirmed.