(242 P.3d 1259)
No. 102,695

NORMAN L. NELSON and GLORIA A. NELSON, *Appellees*, v. STATE OF KANSAS, DEPARTMENT OF AGRICULTURE, DIVISION OF WATER RESOURCES, *Appellant*.

Opinion filed November 19, 2010.

*Brett W. Berry*, of Kansas Department of Agriculture, for appellant.

*David M. Traster*, of Foulston Siefkin LLP, of Wichita, for appellee.

Before RULON, C.J., GREENE J., and KNUDSON, S.J.

GREENE, J.: The Kansas Department of Agriculture Division of Water Resources (DWR) appeals the district court's reversal of an agency order terminating water right file number 1743 due to abandonment, a right owned during these proceedings by Norman and Gloria Nelson. The DWR argues that the district court erred in finding the agency order unsupported by sufficient evidence and in substituting its own judgment for the agency. Concluding that sufficient evidence supported the agency order, we reverse the

district court and remand with directions to reinstate the agency order terminating the Nelsons' water right.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1953, Otto C. Eulert filed his application for a permit to divert water from the Saline River for irrigation of his adjoining agricultural real property in Russell County. The application specified and depicted by plat the particular points of diversion from the river and provided that the diversion would be effected by 8-inch centrifugal pump with capacity of 1600 gallons per minute and associated pipeline sprinkler system. DWR approved the application in October 1953, and the approval specified the use for the water as irrigation, specified the detailed location of permissible points of diversion, and limited the quantity of water to be diverted to 600 acre-feet per year. The water right was perfected in 1969 for a maximum quantity of 278 acre-feet per calendar year, at a maximum rate of 965 gallons per minute, for irrigation on specific tracts of land owned by Eulert.

Before the Nelsons purchased the property and associated water right in 2004 from Eulert, they contacted the DWR to investigate the status of the water right. The DWR assistant water commissioner Stewart advised the Nelsons that there was a potential abandonment issue due to nonuse of the water right. The Nelsons completed their purchase but submitted a letter to the DWR reflecting a conversation with Eulert explaining his nonuse. According to that letter, Eulert admitted the nonuse and gave three reasons for it:

"Mr. Eulert said the main reasons that they quit using the WATER RIGHT was that people above him on the river pumped, which left little water for him. He had informed DWR of the problem, but received little relief.

"Another reason was that their sprinkler systems were hand move equipment which were too difficult and expensive to use.

"The third reason was the crop rotation was alfalfa hay on the bottom land which did not require irrigation."

In October of 2005, the DWR initiated proceedings to declare the water right abandoned and terminated. The proceedings were provoked by an investigation and resulting verified report filed by the assistant water commissioner that stated the last reported use

of water was in calendar year 1978 and found no beneficial use had been made of the water right for 14 consecutive years between 1979 and 1992, and for 11 consecutive years between 1994 and 2004.

The chief engineer of the DWR designated a hearing officer, who conducted an evidentiary hearing under K.S.A. 82a-701 *et seq.* Based on that hearing, the officer filed a recommended initial order, and after the parties were permitted to submit comments, the chief engineer issued his 23-page initial order declaring the Nelsons' water right abandoned and terminated. The order contained detailed findings of fact and conclusions of law, which served as the basis for the declaration of abandonment.

The Nelsons perfected an administrative appeal of the order to the Secretary of Agriculture, who denied their petition for review and ordered the chief engineer's initial order to become the final agency action subject to judicial review. The Nelsons then filed their petition for judicial review to the district court, which found that the agency's declaration of abandonment was not supported by substantial evidence, that the Nelsons had contradicted the prima facie report of the DWR, and that the agency order should be set aside.

The DWR has appealed the decision of the district court.

## STANDARDS OF REVIEW

A final agency action or order of the Secretary of Agriculture is subject to judicial review under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* K.S.A. 2009 Supp. 82a-1901(b); *Frick Farm Properties v. Kansas Dept. of Agriculture,* 289 Kan. 690, 697, 216 P.3d 170 (2009). Although such review is first conducted by district court, on appeal to this court we exercise the same statutorily limited review of the agency's action as does the district court—just as though the appeal had been made directly to this court in the first instance. *Hawley v. Kansas Dept. of Agriculture,* 281 Kan. 603, 611, 132 P.3d 870 (2006).

Although the Judicial Review Act was substantially amended in 2009, we apply the provisions of the Act prior to amendment because the agency action here was final in August 2006, long prior

to the effective date of amendment. See *Redd v. Kansas Truck Center*, 291 Kan. 176, Syl. ¶ 1, 239 P.3d 66 (2010).

The DWR's sole argument on appeal is that the district court erred in setting aside the agency order due to insufficient support for its findings. With regard to our review of agency fact findings and their sufficiency, preamendment K.S.A. 77-621(c)(7) provided that the agency decision was subject to reversal if it was based on a determination of fact that was not supported by evidence that is substantial when viewed in light of the record as a whole. This statutory language, however, was viewed by case law to have a specific meaning. As explained by our Supreme Court in *Redd*,

"[c]ase law defined substantial evidence as evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. [Citation omitted.] Under this holding, the Board's preamendment decision should be upheld if supported by substantial evidence, even though there is other evidence in the record supporting contrary findings. [Citation omitted.]" *Redd*, slip op. at 10.

### OVERVIEW OF STATUTORY FRAMEWORK GOVERNING ABANDONMENT OF WATER RIGHTS IN KANSAS

All water within the state of Kansas is dedicated to the use of the people of the state, subject to control and regulation pursuant to the statutory scheme. K.S.A. 82a-702; *Frick Farm Properties*, 289 Kan. 690. A "water right" is defined by statute as

"any vested right or appropriation right under which a person may lawfully divert and use water. It is a real property right appurtenant to and severable from the land on or in connection with which the water is used and such water right passes as an appurtenance with a conveyance of the land by deed, lease, mortgage, will, or other voluntary disposal, or by inheritance." K.S.A. 82a-701(g).

The water right at issue here is an "appropriation right," which is defined by statute as

"a right, acquired under the provisions of [the Act] to divert from a definite water supply a specific quantity of water at a specific rate of diversion, provided such water is available in excess of the requirements of all vested rights that relate to such supply and all appropriation rights of earlier date that relate to such supply, and to apply such water to a specific beneficial use or uses in preference to all appropriations right of later date." K.S.A. 82a-701(f).

One of the basic attributes of the Kansas system of prior appropriation for water rights is that water right holders who fail to use those rights lose them. K.S.A. 82a-718; *Frick Farm Properties*, 289 Kan. 690, Syl. ¶ 7.

"Every water right of every kind shall be deemed abandoned and shall terminate when without due and sufficient cause no lawful, beneficial use is henceforth made of water under such right for five successive years. Before any water right shall be declared abandoned and terminated the chief engineer shall conduct a hearing thereon. . . .

"The verified report of the chief engineer or such engineer's authorized representative shall be prima facie evidence of the abandonment and termination of any water right." K.S.A. 2009 Supp. 82a-718(a).

The statutory phrase "due and sufficient cause" for any period of nonuse has been defined by regulation to include 10 specific circumstances. K.A.R. 5-7-1. For purposes of this appeal, these circumstances include:

"Adequate moisture is provided by natural precipitation for production of crops normally requiring full or partial irrigation within the region of the state in which the place of use is located.

. . . .

"Water is not available from the source of water supply for the authorized use at times needed."

Any such reason, standing alone, does not operate to excuse the nonuse of the water right unless the reasons purporting to constitute due and sufficient cause shall have in fact prevented, or made unnecessary, the authorized beneficial use of water under the water right at issue. K.A.R. 5-7-1(b).

The holder of a water right must maintain and provide annual water use documentation that is adequate to either demonstrate whether the water right was used, or explain why it was not used, as requested by the DWR. K.S.A. 82a-732(a). A water right holder's failure to maintain and provide the annual water use documentation—taken with other relevant evidence—may support a determination that there was no due and sufficient cause for nonusage in a particular year. *Frick Farm Properties*, 289 Kan. 690, Syl. ¶¶ 11-12.

Does Substantial Evidence Support the Agency's Findings that No Beneficial Use Was Made of Water Under the Water Right Without Due and Sufficient Cause for 1984-1992 and 1994-2004?

Focusing as we must on the agency's final order, the only question framed by the DWR in this appeal is whether the agency's findings of fact are supported by substantial evidence, as that term has been defined by governing case law, and whether those findings support the agency's conclusions of law. See *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 492, 961 P.2d 696 (1998). If we determine that substantial evidence supports the findings that there was no beneficial use of the water right without due and sufficient cause for both of the lengthy periods designated by the final agency order, or for any 5 successive years within those periods, the agency order must be affirmed. First, we examine the question of nonuse, and then we examine whether there has been a showing of due and sufficient cause for that nonuse.

I.  *Period of Cessation of Lawful and Beneficial Use of the Water Right*

The agency order found that there was a period of nonuse attributable to File No. 1743 from 1984 through 2004, or 21 successive years. Indeed, as noted above, Eulert admitted that he "quit" his use of the water right, his annual reports of usage corroborate this fact, and there does not seem to be any dispute regarding the fact that the centrifugal pump and sprinkler system permitted for purposes of diversion had ceased operation as early as 1978.

The Nelsons argued before the agency and now urge on appeal that the consistent cropping of alfalfa on the land should be viewed as a lawful and beneficial use under this water right because the evidence established that such alfalfa crops root to groundwater within the same source of supply. The agency order rejected this argument, reasoning in material part:

"Although the Respondents argue that the diversion of water from an unauthorized point of diversion constitutes 'lawful, beneficial use' under this water

right, there are no facts in the record to evidence the existence of a point of diversion (whether authorized or unauthorized) from which water was applied to the place of use authorized under this water right. The absence of this evidence renders the Respondents' arguments moot.

"The Respondents' argument that sub-surface irrigation of the authorized place of use is an unauthorized point of diversion is not consistent with the rules and regulations promulgated under the authority of the Kansas Water Appropriation Act. K.A.R. 5-1-1, which has the force and effect of law, defines the terms, 'diversion,' 'diversion works' and 'point of diversion.' Sub-surface irrigation does not accord with these definitions.

"K.A.R. 5-1-1(z) defines 'diversion' as:

'. . . the act of bringing water under control by means of a well, pump dam, or other device for delivery and distribution for the proposed use.'

"The definition of 'diversion' as a type of 'device' is rendered more forceful by the definition of 'diversion works,' which is:

'. . . .any well, pump, power unit, power source, dam, and any other devices necessary to bring water under control for delivery to a distribution system by which the water will be distributed to the proposed use and any other equipment required as a condition of the permit, including a check valve, water level measurement tube, meter, or other measuring device. K.A.R. 5-1-1(aa).'

"A 'point of diversion' is:

'. . . the point at which water is diverted or withdrawn from a source of water supply. K.A.R. 5-1-1(zz).'

"There is no evidence to show that sub-surface irrigation of the place of use authorized under this water right requires or involves bringing water under the control of anyone. There is no evidence that a well, pump, dam or other device is used or can be used to deliver water from any source to the place of use. Moreover, there is no evidence to show the 'point' at which this 'diversion' is made. For example, a well is a discreet point from which groundwater is withdrawn from a source. Installing a well and completing it with a pump is the 'act of bringing water under control.' Likewise, a pump placed on a river or stream is a discreet point from which surface water is brought under control for delivery to the authorized place of use. In fact, this water right authorizes diversions from six identifiable pumpsites, or, point of diversion.

"Sub-surface irrigation is not a point of diversion and, therefore, it is neither an authorized nor an unauthorized point of diversion. . . .

"Because there is no evidence to show that sub-surface irrigation is or could constitute a diversion of water and no point of diversion exists under the facts presented, the hydraulic connection between surface water and the alluvial groundwater is irrelevant."

We view this aspect of the agency order as a conclusion of law based on undisputed facts. There was no substantial challenge to the fact that alfalfa planted in bottomland in this area generally

rooted to groundwater. The question is whether such use of groundwater should be viewed as a lawful and beneficial use of water right 1743. At the outset, we note that this natural phenomena is really quite different from the right reflected by the Nelsons' permit. Obviously, such natural crop absorption does not utilize any diversion of the Saline River, at any of the points of diversion in the permit, or by the permitted method of centrifugal pump into a hand-movable sprinkler system.

More importantly, however, is that we agree with the agency's construction and application of its regulations in a manner to support its conclusion that "irrigation is not occurring because there is no application of water to the crop" and, even if this was recognized as "irrigation," natural absorption of groundwater is not a "diversion," is not "appropriated," and is irrelevant to the question of beneficial use pursuant to this specific permit. See *Williams v. City of Wichita*, 190 Kan. 317, 374 P.2d 578 (1962).

We conclude the agency's findings and conclusions as to the cessation of lawful and beneficial use of the water right are fully supported by the evidence and fully consistent with the statutory scheme as implemented through the DWR's regulations.

II. *Whether Due and Sufficient Cause for Nonuse Has Been Shown*

The final order addressed three areas of concern in determining that there had been shown no due and sufficient cause for the periods of nonuse. We will address each such circumstance, examining the agency's findings, record support for same, and their general sufficiency to support the associated conclusions of law.

A. *Economic reasons for nonuse*

The agency order rejected the Nelsons' claim that economic reasons should be considered due and sufficient reason for nonuse, reasoning in part:

"According to the water use reports submitted for File No. 1743, one of the primary reasons water was not used over the years was the high price of fuel (also stated as the high price of pumping). The regulations outlining due and sufficient cause for nonuse (K.A.R. 5-7-1) do not indicate that economic reasons, in and of themselves, constitute due and sufficient cause for non-use. '[I]f the price of fuel

or pump repairs is high enough or crop prices low enough to make the operation of irrigation equipment unprofitable, such circumstances will not constitute due and sufficient cause for non-use. . . . The principle that economic decisions do not constitute due and sufficient cause has been upheld in numerous administrative decisions and by courts of other states. (Citations omitted.)' 43 Kan. L. Rev. at 815-816. Therefore, the economic reasons for nonuse, such as 'high price fuel,' 'high lifting costs,' 'lifting and pumping costs,' and 'prohibitive pumping costs,' do not constitute due and sufficient cause for nonuse pursuant to K.A.R. 5-7-1. Consequently, due and sufficient cause does not exist for the years 1994, 1996, 1997 and 2001 unless there is another basis for a finding that due and sufficient cause exists."

Our review of the record—including the reports filed by the Nelsons' predecessor—indicate that economic reasons were given as one of the reasons for nonuse in years 1981, 1988, 1990, 1991, 1994, 1995, 1996, 1997, 1999, 2000, 2001, and 2002. These economic reasons are variously characterized in the reports as "high price of fuel," "high lifting costs," "high fuel costs," "pumping costs too high," "pumping costs prohibitive," and "prohibitive pumping costs." These reasons were the *sole* reason given for nonuse in years 1994, 1996, 1997, 1999, and 2001.

As a matter of law, economic reasons such as these do not constitute due and sufficient cause for nonuse. K.A.R. 5-7-1 lists 10 specific circumstances that may be considered "due and sufficient cause" under K.S.A. 82a-718; economic reasons such as high fuel costs, high pumping costs, or high lifting costs are not among or within any of the 10 recognized circumstances. Our Supreme Court seems to have agreed with the chief engineer in rejecting such costs as due and sufficient cause in *Frick Farm Properties*, where the court quotes with apparent agreement the chief engineer's legal conclusion in that case that

"[e]conomic reasons are not listed in K.A.R. 5-7-1(a) as a circumstance considered as due and sufficient cause for non-use. Making a decision not to irrigate for economic reasons could not have prevented [landowner] from irrigating or made it possible to produce a normally irrigated crop without irrigation. Again, [landowner] simply chose not to irrigate, and the criteria of K.A.R. 5-7-1(b) have not been satisfied." 289 Kan. at 699.

Indeed, the DWR has consistently held that economic reasons are not due and sufficient cause for nonuse. See Peck and Owen,

*Loss of Kansas Water Rights for Nonuse*, 43 Kan. L. Rev. 801, 816, n.111 (1995). We note that the Nelsons have abandoned any dispute of this aspect of the agency's final order.

We conclude that substantial evidence supports the agency's findings that a reported economic reason in many of the years at issue does not constitute a due and sufficient reason for nonuse. In particular, no further analysis is required to demonstrate that there was nonuse without due and sufficient cause in years 1994, 1996, 1997, 1999, and 2001. Because the Nelsons' predecessor filed no report in years 1979, 1980, 1982, 1983, and reported nonuse without *any* reason for year 1998, the focus of our remaining analysis will be on the remaining years only.

B. *Adequate rainfall pursuant to K.A.R. 5-7-1(a)(1)*

The agency rejected the Nelsons' claim that adequate rainfall in certain years should be considered due and sufficient cause for nonuse, reasoning in part:

"[A]dequate rainfall can constitute due and sufficient cause for nonuse where the crops grown would normally require 'full or partial irrigation' within the given region of the state. K.A.R. 5-7-1(a)(1). Documents in the record, and the testimony of Mr. Nelson, indicate the crop grown over the years was alfalfa.

. . . .

"Mr. Nelson testified that alfalfa will, in areas like this one, acquire the water it needs from subsurface moisture in the soil and from alluvial groundwater. . . .

. . . .

"If irrigation is not necessary to produce the desired crop, then the crop cannot be considered to be an irrigated crop regardless of the planting rate. The testimony was that irrigation was necessary to start a crop, so the Eulerts' alfalfa was an irrigated crop in the year it was 'started,' but not an irrigated crop in other years.

. . . .

"More likely the alfalfa crop was already established in 1995, and, although the Eulerts could have chosen to irrigate, it was not necessary in order to produce the desired crop. Under those circumstances, the costs of pumping certainly could be a consideration. Therefore, the Eulerts did not produce an irrigated crop, and the Respondents have not established due and sufficient cause for nonuse pursuant to K.A.R. 5-7-1(a)(1) for the year 1995.

"The Respondents provided daily streamflow data only for the months of July and August in 1997, 1998 and 1999. Because the average streamflows for these months were high at the downstream gage and the previous owner did not claim low flow as a reason for not irrigating, the data cannot support a finding that low flows prevented irrigation. Nevertheless, the Respondents may have offered the

data to show that sufficient precipitation prevented irrigation needed by the crops in July and August of these years.

"Nevertheless, the Eulerts' alfalfa crop was not an irrigated crop in the years it was not 'started' and, more likely than not, rainfall in July and August did not make irrigation unnecessary. The analysis applied to the year 1995 also applies to the years 1997 and 1999. That is, it is not likely that the alfalfa crop was started in 1997 or 1999, because economic factors also were given as a reason for not irrigating in those years. No reasons were given for not irrigating in 1998, but the Respondents have not shown that a crop of alfalfa was started in July or August of that year.

"Additionally, the record, as a whole, supports the conclusion that any rainfall that occurred in 1995, 1997, 1998 and 1999 did not, in fact, prevent irrigation from occurring or make irrigation unnecessary. K.A.R. 5-1-7(b). With the exception of 1998, the previous owner reported high pumping costs as at least one of the reasons irrigation did not occur for every year from 1994 through 2002. In 1998, he simply failed to state any reason. It is significant to note that only economic reasons were given for five years (1994, 1996, 1997, 1999 and 2001) indicating there were no other considerations in five of this nine-year period. More likely than not, irrigation would not have occurred in 1995, 1997, 1998 and 1999 because of the 'high pumping costs' (i.e., economic factors) and not because of timely rainfall."

For these reasons, the agency order rejected landowners' claim that due and sufficient cause for nonuse was established by adequate moisture from natural precipitation for the production of their alfalfa. K.A.R. 5-7-1(a)(1) acknowledges this basis for due and sufficient cause for nonuse, but only where the crops "normally requir[e] full or partial irrigation within the region of the state in which the place of use is located." Whether alfalfa grown by the Nelsons and their predecessor was a crop normally requiring full or partial irrigation in this area seems to have been a matter of dispute.

Although the DWR witness Stewart was unable to say whether alfalfa was a crop normally requiring irrigation in this area, the record reflects that the Nelsons' predecessor made an admission in a 2005 letter to Nelson that he "quit using the water right" for three reasons, and his third reason was "the crop rotation was alfalfa hay on the bottom land *which did not require irrigation*." (Emphasis added.) And, notably, when Nelson was asked at the hearing about this matter, he seemed to indicate that the crop planted at 15 pounds per acre was normally an irrigated crop "if it

weren't *in the bottom land* here," implying that alfalfa is *not* an irrigated crop in this area when planted in "the bottom land." Finally, the DWR assistant commissioner Stewart opined that "static water level in this area is approximately 10 to 15' deep. It appears that alfalfa would root to groundwater." We view all these record references as substantial evidence that the crop here was not one that normally required full or partial irrigation within this region— and we consider the "region" as bottomland contiguous to the Saline River in Russell County.

The agency order correctly reflects that either the historic reports or the Nelsons' later claims reported that there was adequate rainfall in July and August of 1995, 1997, 1998, and 1999. The order rejected these claims as due and sufficient cause for nonuse because these years overlapped either with the years that economic factors were among the reported reasons for nonuse or there was a complete failure to provide *any* reason for nonuse (1998). As noted by the agency order, "irrigation would not have occurred in [these years] because of the 'high pumping costs' . . . and not because of timely rainfall."

We conclude that there was substantial evidence to support the agency's rejection of a claim that adequate rainfall should be considered due and sufficient cause for nonuse during the years so claimed by the Nelsons.

C. *Unavailability of water pursuant to K.A.R. 5-7-1(a)(3)*

The agency order also rejected the Nelsons' claim that low flows in the Saline River should be considered due and sufficient cause for nonuse, reasoning in part:

"Under the facts here, the credibility of any claims of low flows (whether made by the previous owner or the Respondents) can only be determined by an examination of the evidence, as a whole. The previous owners began claiming flows in 1984, and consistently claimed low flows as at least one reason for not using water from 1984 through 1991. Low flows were not again given as a reason for not irrigating until 2000, 2002, and 2003. These claims are considered to have been made by persons with personal knowledge of the circumstances at the time the reports were filed. The credibility of these reports must be judged in light of the contemporaneous claims on the water use reports themselves as well as the available streamflow data provided by the Respondents and DWR.

. . . .

"The previous owner claimed that high costs were a reason that irrigation did not occur in 1998, 1990, 1991, 1994, 1996, 1997, 1999, 2000 and 2001. The Eulerts only produced irrigated alfalfa in the years the crop was 'started' and, more likely than not, streamflow in these years did not make irrigation unnecessary. The analysis applied to the years 1995, 1997 and 1999 also apply to the years in which the previous owner claimed both low streamflow and high costs as reasons for not irrigating (1998, 1990, 1991 and 2002). That is it is not likely that the alfalfa crop was started in these years, because economic factors also were given as a reason for not irrigating. For the remaining years in which economic factors also were given for not irrigating (1984-1986, 1989 and 2003), the Respondents have not shown that a crop of alfalfa was started in any month of those years.

. . . .

"As a result, due and sufficient cause pursuant to K.A.R. 5-7-1(a)(3) has not been established for 1984 through 1992, 2000, 2002, and 2003. (In accordance with the findings above, we need not address Respondents' assertions regarding years prior to 1984.)"

For these reasons, the agency rejected the Nelsons' argument that due and sufficient cause for nonuse was established by their predecessor's reports of low flow in the river. K.A.R. 5-7-1(a)(3) provides that it shall be considered due and sufficient cause if "[w]ater is not available from the source of water supply for the authorized use at times needed." Reports filed by Eulert indicate that low flow was at least one of the reasons for nonuse during the years 1984 through 1991 and years 2000, 2002, and 2003.

The agency's final order concedes that "it is reasonable to conclude that streamflows, indeed, could have been low at times in 1984, 1985, 1988 and 2000." The order also conceded that "streamflows might have been unfeasibly low in the years 1984-86, 1988-91, 2002, and 2003." The order rejects the conclusion, however, that these low flows should be considered due and sufficient cause for nonuse because the flow did not in fact prevent or make unnecessary the authorized use (irrigation), as required by K.A.R. 5-7-1(b). This conclusion was based upon two additional facts: (1) overlap of the years of low flow with the years in which the landowner claimed nonuse due to economic factors means that low flows alone did not "prevent" irrigation; and (2) in the remaining years of claimed low flow, there was no showing that a crop of alfalfa was started in any month of those years, so—again—the low

flows did not in fact prevent irrigation but rather there was no need for irrigating alfalfa that had already rooted to groundwater.

Additionally, the agency order notes that the DWR field report substantiates a conversation with Eulert explaining that in the event of low flow, he had the right to request water and the procedure for doing so. The DWR never received such a request, and the agency concluded that this failure to request enforcement of his water right "undermines the claim of unavailability of water."

"If a water right holder is claiming that water was not used because no water was available, but the water right carries the highest priority for the given source and water would have been available had the holder requested administration (enforcement of the priority system, then due and sufficient cause may be denied." Peck and Owen, *Loss of Kansas Water Rights for Nonuse*, 43 Kan. L. Rev. 801, 810 (citing DWR Admin. Policy 92-3 [Aug. 28, 1992]).

Thus, the agency order concluded—with supporting evidence—that due and sufficient cause was not established by low flows in years 1984 thru 1992, 2000, 2002, and 2003—*even though low flows were conceded for some of these years.* Our review of the record shows that the agency's findings and conclusions in this regard are fully supported by substantial evidence, both in the form of landowner's annual reports of usage and U.S. Geologic Survey data as to flow.

ARE THE NELSONS' CHALLENGES TO PROCEDURAL ASPECTS OF THE HEARING, VALIDITY OF THE APPLICABLE REGULATIONS, OR OTHER CHALLENGES TO THE AGENCY PROCEDURE OR FINAL ORDER PROPERLY BEFORE THIS COURT?

On appeal, the Nelsons' brief challenges numerous procedural aspects of the administrative hearing procedure, including: (1) the quantum of evidence required by the agency; (2) the burden of proof analysis employed by the agency; (3) unfulfilled requirements for the verified report in order to shift the burden of proof; (4) inappropriate remedy considered by the agency; and (5) procedural regulations utilized exceeded authority of the agency. It is elementary that such challenges to the agency proceedings may not be considered by this court in the absence of a cross-appeal, and the Nelsons made no such filing. See *Mid-Continent Special-*

*ists, Inc. v. Capital Homes,* 279 Kan. 178, 191-92, 106 P.3d 483 (2005).

Appellees have also suggested that evidence cited or relied on by the agency should not be considered substantial for various reasons. Among the evidence questioned in this regard is data from gauge reports showing river flows at a location downstream from the Nelsons' property. Appellees also urge us to consider other evidence that was not considered or was rejected by the agency, such as their testimony that upland alfalfa in the area is an irrigated crop. We have examined all such evidence, but it is not our function to reweigh competing evidence or assess the credibility of witnesses when applying the preamendment standard of review applicable here. We accept all evidence and reasonable inferences that support or tend to support the findings as true, and we must disregard all conflicting evidence. *Frick Farm Properties,* 289 Kan. at 709, citing *Trees Oil Co. v. Kansas Corporation Comm'n,* 279 Kan. 209, 226, 105 P.3d 1269 (2005).

Finally, we note that Appellees have urged us to adopt certain procedural rules from "Western water law" authorities, including a clear and convincing proof requirement and the principal that resumption of use cures a forfeiture. These issues were not raised before the agency, and we decline to consider them on appeal. See K.S.A. 77-617; *Miller v. Bartle,* 283 Kan. 108, 119, 150 P.3d 1282 (2007).

In summary, we conclude the agency's findings of fact are supported by substantial evidence and are sufficient to support the agency's conclusions of law. The district court erred in concluding otherwise. Accordingly, we are compelled to reverse the district court and remand with directions to reinstate the agency order terminating water right 1743.

Reversed and remanded with directions.